## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

DR. MAHENDRA AMIN, M.D.,  )
           )
   Plaintiff,    )
           )  Case No. 25-cv-10582
v.          )
           )
SPIEGEL & GRAU LLC   )
           )
   Defendant.   )

## COMPLAINT

### JURY TRIAL DEMANDED

Plaintiff Dr. Mahendra Amin, M.D. ("Plaintiff" or "Dr. Amin"), for his complaint against defendant Spiegel & Grau LLC ("Defendant"), pleads as follows:

### INTRODUCTION

1. This Complaint arises from Defendant's publication of an essay, published on January 28, 2025 in the book entitled *Holy Ground: On Activism, Environmental Justice, and Finding Hope* (the "Book"), that contains multiple false and defamatory statements of and concerning Dr. Amin, who is a private figure.

2. The essay falsely and defamatorily accuses Dr. Amin of: (1) performing gynecological procedures on women detained by the United States Immigration and Customs Enforcement ("ICE") at the Irwin County Detention Center ("ICDC") without being a gynecologist and/or licensed gynecologist, when in actuality Dr. Amin is a licensed gynecologist with decades of experience; (2) being a "uterus collector" who performed hysterectomies on "nearly every woman who went to see him" who was detained by ICE at the ICDC, when in

actuality he only performed two hysterectomies on such women, both of which were deemed medically necessary by independent experts; and (3) not having translators present when he treated such women and otherwise failing to inform the women regarding their treatment, when in fact Dr. Amin always had translators present, always explained his proposed procedures, and obtained the informed consent of the patient as to every procedure on ICDC detainee, as attested by witnesses and documented by consent forms signed by the patients.

3.      The essay appears to relay allegations made by an ICDC nurse named Dawn Wooten who did not observe Dr. Amin's treatment and whose accusations of mass hysterectomies without consent or necessity, first made in September 2020, have been widely and definitively discredited.

4.      The essay falsely and defamatorily portrays Dr. Amin as having had "the explicit goal of controlling [Black, Indigenous, and migrant women's] reproductive lives," whose "wombs were ripped out of their bodies," as part of a "plantation mentality" toward such women.

5.      The false and defamatory statements in the essay convey to the average reader that Dr. Amin was an evil doctor seeking to carry out a sterilization campaign on immigrant women detained by ICE at ICDC in order to defraud the government and enrich himself.

6.      The statements and insinuations leveled toward Dr. Amin were reckless, vile, and devoid of any decency or concern for Dr. Amin's reputation and livelihood.

7.      The statements are false and discredited.

8.      Years before the publication of the essay, the statements were determined to be false, with multiple media outlets and investigations reporting that Ms. Wooten's allegations of mass hysterectomies were not accurate.

9.      Indeed, _**all**_ procedures Dr. Amin performed for ICDC patients were medically necessary, done with patient knowledge and consent as demonstrated by signed forms indicating informed consent, and approved by ICE's independent preapproval process that must be done before any medical procedure on a patient, and independent experts affirmed that both hysterectomies were medically necessary and even "life-saving."

10.     The statements briefly cite a Congressional investigation, apparently referencing the U.S. Senate Permanent Subcommittee on Investigations, without noting that the Report of that Subcommittee **contradicted** Ms. Wooten's allegations in stating that Dr. Amin had committed two hysterectomies, both medically necessary.

11.     Defendant has admitted that the statements are false and the result of its fault, stating as follows on a website hosted by Defendant for the book: "In a limited number of copies of the book released to the public in advance of publication there were several statements about Dr. Mahendra Amin, a physician who has previously performed services for persons detained at the Irwin County Detention Center in Ocilla, Georgia. **The statements about Dr. Amin were not accurate.** All statements about Dr. Amin have since been removed from the book. **The publisher and author regret the error.**" https://www.spiegelandgrau.com/holyground, (emphases added), last visited on December 2, 2025.

12.     The false and defamatory statements assassinated Dr. Amin's character and damaged his reputation as a physician.

13.     Book publishers have an important role to play in our society. But they do not have an unfettered right or privilege under the First Amendment to injure the reputations of private individuals by publishing and broadcasting false and defamatory statements against them.

3

14.     Instead of considering its important role in sharing news and truth, Defendant chose to chase a false narrative that supported its thesis that there is a system that has "the explicit goal of controlling [Black, Indigenous, and migrant women's] reproductive lives," that such women's "wombs were ripped out of their bodies" as part of a "plantation mentality," all at the expense of Dr. Amin, a private individual, a good and trusted doctor—an immigrant himself—who has dedicated his life to providing quality healthcare services for marginalized and underserved communities.

15.     Defendant set forth those false statements well after it was clear that Ms. Wooten's allegations regarding Dr. Amin had been disproven, which Defendant knew or should have known.

16.     As a result of the conduct described herein, Defendant crossed the threshold from speech protected by the First Amendment to enter the arena of actionable defamation, for which it must be held legally accountable.

## PARTIES

17.     Dr. Amin is an individual who resides in Douglas, Georgia, and is a citizen of the State of Georgia.

18.     Defendant is a New York limited liability company with its principal place of business located in New York, New York whose members, Celina M. Spiegel and Julie Grau, are natural persons who are citizens of the State of New York and not citizens of Georgia.

19.     Defendant is a multi-platform publisher that began as a Penguin Random House imprint.  Defendant publishes books and, according to its website, "through strategic and collaborative partnerships and with the experienced guidance of our multi-media team, we are

4

able to amplify writers' and creators' voices across a range of platforms that best suit a story's message, enlarging the very definition and scope of publishing."

https://www.spiegelandgrau.com/about-us. Defendant's books include prominent titles such as Ta-Nehisi Coates's *Between the World and Me* and *Just Mercy* by Bryan Stevenson.

20.    Defendant, as the book publisher responsible for the publication of the essay and the false and defamatory statements therein, is liable to Dr. Amin.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there exists complete diversity of citizenship between Dr. Amin and the Defendant and the amount in controversy exceeds $75,000.

22.    Venue is proper pursuant to 28 U.S.C. § 1391 because Defendant and its members reside in this judicial district and, in the alternative, because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and because this is a judicial district in which Defendant is subject to the court's personal jurisdiction.

## FACTUAL BACKGROUND

### Dr. Amin

23.    Dr. Amin was born, raised, and completed medical school in India.

24.    Dr. Amin grew up very poor, living in homes with dirt floors. But his parents sacrificed to help him through medical school. His parents sold the only land they owned and borrowed money to make sure he could finish his education.

25.    Dr. Amin lived up to his parents' sacrifice, becoming one of only eight out of 300 medical student hopefuls who could ultimately enroll in medical school from his district in India.

26.     When he first came to the United States, he worked in a New York City subway store and sold newspapers in Brooklyn, working 12 hours a day, six days a week, all while studying for additional medical exams required of foreign students.

27.     He completed his Residency in Gynecology in the United States and has been licensed to practice medicine in Georgia for nearly 40 years.

28.     Dr. Amin remembers his humble beginnings and the power of someone sacrificing so that others can have a better future.  That is why he has practiced in underserved areas nearly his entire medical career.

29.     Over the course of his medical career, on a regular basis, he has worked 36-hour shifts, seen over 60 patients in a day, and delivered over 400 babies in a year.

30.     He has often worked for free and for many years, he kept regular daily office hours and performed hospital surgeries at night, all to ensure that—as much as he could prevent it—no one who needed care would go without.

31.     Dr. Amin regularly treats uninsured patients (some who drive over 100 miles to see him) and accepts whatever patients can pay in return.

32.     He never turns away a patient for inability to pay.

33.     He regularly treated patients in area jails because he knows that if he does not provide treatment, it is likely the patients will go without.

34.     Until recently, Dr. Amin was the sole OB/GYN physician in Irwin County, Georgia.  At the present time, Dr. Amin is one of only two OB/GYN physicians in Irwin County, Georgia.

35.     Many of Dr. Amin's patients fall below the poverty line and are on Medicaid.

36.     Dr. Amin provides medical care to patients at a local health clinic at least once per week on a voluntary basis.

37.     Before Ms. Wooten first made false allegations that he was conducting mass hysterectomies and sterilizations without consent, Dr. Amin provided gynecological medical services to patients detained at ICDC.

38.     In the early to mid-1990s, Irwin County Hospital was on the brink of closing its doors.  Dr. Amin put up his own money, hired a management team, and kept the hospital alive. Indeed, the hospital improved with Dr. Amin's leadership—adding more patient rooms and several other upgrades.

39.     On his rare weekends away, Dr. Amin remains "on call" and instructs his nursing staff to call him if any of his patients go into labor so that he can return and deliver the babies and care for their mothers.

40.     Dr. Amin loves this country and all it has afforded him, and he is determined to give back.

41.     He is devoted to medicine and to providing care to underserved communities.


**Ms. Wooten's media campaign and her actual complaint—two different things**

42.     On September 14, 2020, Project South, an organization that portrays its mission as "eliminating poverty and genocide" and "cultivating strong social movements," sent a letter to the media which purported to be addressed to the Department of Homeland Security, the ICE Atlanta Field Office, and the ICDC ("Letter").

43.     As part of the release of the Letter, Ms. Wooten went on a media campaign as the face of the Letter, assisted by the Government Accountability Project, an employee for whom appeared on camera with Ms. Wooten on MSNBC.

44.     Indeed, Ms. Wooten sought the limelight, going so far as to solicit funds through a GoFundMe page, which has generated over $100,000 in donations to date.

45.     The Letter contained allegations regarding conditions at the ICDC, mostly relating to COVID-19.  The Letter also contained allegations of high rates of hysterectomies at ICDC.

46.     Ms. Wooten, the alleged source of the information contained in the Letter, did not seek to be anonymous and did not seek any other protections that could be afforded to true whistleblowers who file formal complaints.

47.     The Letter was not part of a complaint filed in any court or submitted as part of any administrative proceeding.

48.     Ms. Wooten did not file the Letter in the Department of Homeland Security Office of Inspector General's whistleblower web portal.

49.     Ms. Wooten filed an actual, but *separate* complaint in which she alleged she had been retaliated against by her employer, onto which the Government Accountability Project signed.

50.     The complaint that Ms. Wooten actually filed through the whistleblower web portal system contained zero allegations about hysterectomies and not a word about care from any gynecologist.

51.    Medical records that Ms. Wooten had access to did not show mass hysterectomies were performed on women detained at ICDC.

52.    There are no medical records showing a lack of consent for any hysterectomy performed by Dr. Amin on any woman detained at ICDC.

53.    Medical records show that Dr. Amin only performed two hysterectomies on women detained at ICDC.

54.    Ms. Wooten never accompanied any women detained at ICDC to medical appointments with Dr. Amin or any other physician outside the ICDC.

55.    Ms. Wooten has never identified any women who she claimed received an unconsented-to hysterectomy.

**Ms. Wooten's allegations discredited**

56.    Although the Letter did not identify Dr. Amin by name, as the only doctor providing gynecological treatment on ICDC patients outside of ICDC, his identity was discernible.

57.    A few outlets, including MSNBC and Prism, identified Dr. Amin by name and reported on the accusations in the Letter.  Many other outlets, however, noted that the allegations had not been corroborated and identified reasons to doubt the allegations.

58.    Only one day after the Letter was sent, it was confirmed that Dr. Amin had performed only two hysterectomies on ICDC patients.

59.    ICE also confirmed that patient consent and independent preapproval are secured before all procedures on women detained by ICE, including the ICDC patients.

60.    It is beyond reasonable belief that detainees in an ICE facility, such as ICDC, could undergo surprise hysterectomies without consultation and consent.

61.    Indeed, an ICDC patient would not even be referred to a health care provider outside of ICDC such as Dr. Amin without that patient requesting treatment, ICDC staff referring the patient to the outside provider, and the patient voluntarily undertaking the treatment.

62.    ICE performs an independent review for all surgical procedures and issues its approval or denial for such procedures.

63.    This review process requires ICDC to review a patient's medical records and determine if the requested procedure is medically necessary.  The process typically takes around two weeks.

64.    Dr. Amin has never performed a procedure on an ICDC patient without going through this process.

65.    ICE provided such review and approval for both hysterectomies that Dr. Amin performed on ICDC patients.

66.    Several independent physician reviews of those procedures confirm that the procedures were medically necessary.

67.    Signed medical consent forms, for the hysterectomies as well as all of the procedures Dr. Amin performed on ICDC patients, confirm that all procedures were discussed and consented to by ICDC patients.

68.    Dr. Amin always obtains informed consent from his patients.

69.    Dr. Amin utilizes interpreters when treating patients who do not speak or understand English.

70.    When Dr. Amin treated ICDC patients, he was supervised by at least one other person.  This was a matter of protocol.

71.    Dr. Amin has never abused any patient.

72.    After an initial wave of media coverage, the news cycle moved on to other stories, as journalists were unable to substantiate Ms. Wooten's allegations and/or found evidence to contradict them.

73.    Of the outlets that continued to publish about Ms. Wooten's allegations, many published information tending to contradict the hysterectomy allegations.

74.    For example, on September 17, 2020, two days after publishing the article identifying Dr. Amin that is cited in the chapter of the Book published by Defendant, Prism published an article in which it relayed that many Douglas residents viewed Dr. Amin as a "pillar in the community;" that Ms. Wooten was "complicit" in the mistreatment immigrants suffered at ICDC, with which Dr. Amin had no involvement; that one patient in the community asked Dr. Amin to perform a hysterectomy on her but he declined to do so and that the same patient said Dr. Amin provided her free care when her insurance lapsed and otherwise worked with her to provide care; that "an associate in the medical field" said that "[t]here is no way this was being done under the radar and without a paper trail;" and that likewise the deputy secretary of the Department of Homeland Security said that "his agency has not seen any payments or requests for payment for the hysterectomies Amin allegedly performed, and that it is 'virtually inconceivable that any of this could have been going on without multiple sets of records.'"

**Investigations confirm no mass hysterectomies or sterilization**

75.     Following Ms. Wooten's jaw-dropping allegations and the ensuing media coverage, multiple government bodies investigated.

76.     No investigation corroborated Ms. Wooten's allegations of mass hysterectomies.

77.     No investigation resulted in any penalty against Dr. Amin.

78.     The Georgia Composite Medical Board cleared Dr. Amin of wrongdoing and allowed him to continue practicing medicine, as he still does.

79.     An investigation of a Senate subcommittee confirmed that only two hysterectomies were performed, both approved by ICE as medically necessary.

### Holy Ground

80.     Sometime late in 2024, **_years_** *after* Ms. Wooten's claims were discredited, excerpts of the Book became available on Google Books.

81.     Defendant also distributed some copies of the Book prior to its planned January 2025 publication so that they could be published then.

82.     An essay in the Book published by Defendant was based on Ms. Wooten's long-discredited accusations of mass hysterectomies and sterilization without consent or knowledge.

83.     The essay conveys a grossly inaccurate and false impression of Dr. Amin.

84.     Accusations stated in the essay that Dr. Amin performed hysterectomies and sterilized patients without their knowledge or consent are false and defamatory *per se*.

85.     Nothing in the essay changes the understanding an ordinary viewer would have of the accusations.

86.     Indeed, by using Ms. Wooten's accusations to support its argument that a "plantation mentality" and "Donald Trump's unconscionable treatment of migrants" resulted in

"Black and Indigenous women, migrant women and white women, barely adolescent girls and older women have all had the agency of their bodies seized by others with the explicit goal of controlling their reproductive lives," and "some of whose wombs were ripped out of their bodies," Defendant emphasized the false and defamatory nature of the accusations.

87.     Defendant published at least the following false and defamatory statements of and concerning Dr. Amin:

> On September 14, 2020, in a footnote to President Donald Trump's unconscionable treatment of migrants, a nurse named Dawn Wooten, who worked at the Irwin County Detention Center in Ocilla, Georgia, filed a whistleblower complaint. She said that Dr. Mahendra Amin—the center's leading doctor who was not even a gynecologist—allegedly told nearly every woman who went to see him that she had to have a hysterectomy. Wooten referred to him as a "uterus collector."

> Adding to this atrocity, Dr. Amin spoke no Spanish, and many of the vulnerable, detained women he violated spoke no English. The New York Times reported, "Both the reviewing doctors and all of the women interviewed by the Times raised concerns about whether Dr. Amin had adequately explained the procedures he performed or provided his patients with less invasive alternatives. Spanish-speaking women said a nurse who spoke Spanish was only sporadically present during their exams." They did not have the faintest idea what he was doing to them. Meanwhile, as an independent physician who was under contract with US Immigration and Customs Enforcement, this doctor was paid for each individual procedure that he executed.

> Upon hearing about the whistleblower's complaint, House Speaker Nancy Pelosi described the conditions at the detention center as "a staggering abuse of human rights." On October 2, 2020, the House of Representatives condemned the practice in a congressional resolution. A congressional investigation finally revealed that "female detainees appear to have undergone excessive, invasive, and often unnecessary gynecological procedures" by a physician who was not even certified as a gynecologist.

> And so, over these many years, Black and Indigenous women, migrant women and white women, barely adolescent girls and older women have all had the agency of their bodies seized by others with the explicit goal of controlling their reproductive lives. I think of enslaved women—my great-great-grandmothers, their sisters and friends, and other enslaved women whose bodies were trafficked and raped on the plantations of my home state. Whose children were seized and sold like animals. Whose capacity to bear children was considered either an asset or a liability but rarely something deeply personal, something that demanded autonomy.
>
> I look at detainees whose children were ripped from them, some of whose wombs were ripped out of their bodies. Yes, I know that we have made great progress since the time when plantations dominated our economy. And yet, as we see too often with our justice system, and with our medical system, the plantation mentality endures.

88.    The statements are false.

89.    Dr. Amin is a licensed gynecologist.

90.    Dr. Amin has decades of experience treating patients.

91.    Dr. Amin was not "the center's leading doctor" and had no control over the conditions at the detention center.

92.    Dr. Amin only conducted two hysterectomies.

93.    Both of those hysterectomies were necessary and done with the patient's knowledge and consent, as were all of the procedures Dr. Amin performed on ICDC patients.

94.    By September 17, 2020, news organizations had reported on the fact that ICE only had records for two hysterectomies performed on women detained at ICDC.

95.    On November 15, 2022, the United States Senate Permanent Subcommittee on Investigations definitively stated that only two hysterectomies had been performed by Dr. Amin on ICDC patients and that ICE had approved both as medically necessary.

96.    Dr. Amin only conducted medically necessary procedures, and all of his procedures on ICDC patients had to be pre-approved as medically necessary by ICE.

97.    Dr. Amin always had Spanish-speaking staff and, for other non-English languages, a translation telephone line provided by the government, through which he communicated with patients who did not speak English.

98.    Dr. Amin never treated patients without obtaining informed consent, including explaining the procedure, as documented by signed inform consent forms.

99.    On January 8, 2025, Dr. Amin through counsel sent a letter through which he demanded from Defendant and Ms. Flowers damages and removal of defamatory content arising from Defendant's publication of the defamatory statements.

100.    On January 15, 2025, Defendant published on its website a retraction, as follows:

**Notice – Retraction**

*Holy Ground* by Catherine Coleman Flowers

In a limited number of copies of the book released to the public in advance of publication there were several statements about Dr. Mahendra Amin, a physician who has previously performed services for persons detained at the Irwin County Detention Center in Ocilla, Georgia.

The statements about Dr. Amin were not accurate. All statements about Dr. Amin have since been removed from the book.

The publisher and author regret the error.

101.    The notice of retraction, on Defendant's website, was not published in as conspicuous and public a manner as the defamatory statements, which were published on Google books and distributed in some copies of the Book that were published.

15

102.    Defendant also stopped some copies of the Book from being distributed, printed a new version eliminating reference to Dr. Amin, and eliminated reference to Dr. Amin in the eBook and audiobooks would eliminate all reference to Dr. Amin, but the defamatory statements were published to and read by third parties via Google Books and the copies of the Book that had already been distributed.

103.    However, on January 28, 2025, Defendant published the Book, some versions of which included the defamatory statements.

**COUNT I - DEFAMATION**

104.    Dr. Amin incorporates by reference paragraphs 1-103 of this Complaint as if fully restated herein.

105.    Defendant is responsible for the words it publishes, including the communication of defamatory matter they published in the essay of and concerning Dr. Amin as set forth herein and including the following:

(a) On September 14, 2020, in a footnote to President Donald Trump's unconscionable treatment of migrants, a nurse named Dawn Wooten, who worked at the Irwin County Detention Center in Ocilla, Georgia, filed a whistleblower complaint. She said that Dr. Mahendra Amin—the center's leading doctor who was not even a gynecologist—allegedly told nearly every woman who went to see him that she had to have a hysterectomy.  Wooten referred to him as a "uterus collector."

(b) Adding to this atrocity, Dr. Amin spoke no Spanish, and many of the vulnerable, detained women he violated spoke no English.  The New York Times reported, "Both the reviewing doctors and all of the women interviewed by the Times raised concerns about whether Dr. Amin had adequately explained the procedures he performed or provided his patients with less invasive alternatives.  Spanish-speaking women said a nurse who spoke Spanish was only sporadically present during their exams."  They did not have the faintest idea what he was doing

16

to them.  Meanwhile, as an independent physician who was under contract with US Immigration and Customs Enforcement, this doctor was paid for each individual procedure that he executed.

(c) Upon hearing about the whistleblower's complaint, House Speaker Nancy Pelosi described the conditions at the detention center as "a staggering abuse of human rights."  On October 2, 2020, the House of Representatives condemned the practice in a congressional resolution.  A congressional investigation finally revealed that "female detainees appear to have undergone excessive, invasive, and often unnecessary gynecological procedures" by a physician who was not even certified as a gynecologist.

(d) And so, over these many years, Black and Indigenous women, migrant women and white women, barely adolescent girls and older women have all had the agency of their bodies seized by others with the explicit goal of controlling their reproductive lives.  I think of enslaved women—my great-great-grandmothers, their sisters and friends, and other enslaved women whose bodies were trafficked and raped on the plantations of my home state.  Whose children were seized and sold like animals.  Whose capacity to bear children was considered either an asset or a liability but rarely something deeply personal, something that demanded autonomy.

(e) I look at detainees whose children were ripped from them, some of whose wombs were ripped out of their bodies.  Yes, I know that we have made great progress since the time when plantations dominated our economy.  And yet, as we see too often with our justice system, and with our medical system, the plantation mentality endures.

106.    Those statements, as they relate to and concern Dr. Amin, are false.

107.    The statements, as they relate to and concern Dr. Amin, are defamatory.

108.    The statements specifically name and identify Dr. Amin.

109. Accordingly, persons who know or know of Dr. Amin would reasonably understand the episode to be talking about Dr. Amin, and the statements are of and concerning Dr. Amin.

110. The statements constitute defamation *per se* in that they directly and/or implicitly impute actions to Dr. Amin that injure his professional reputation.

111. The statements constitute defamation *per se* in that they directly and/or implicitly impute actions to Dr. Amin that are crimes punishable by law.

112. The statements constitute defamation in that they directly and/or implicitly impute actions to Dr. Amin that are defamatory and injurious to his reputation on their face and can be so understood without reference to any additional or extrinsic facts.

113. Evidencing negligence and a reckless disregard for truth or falsity, Defendant published statements about Dr. Amin that contradicted known facts that the accusations against Dr. Amin were false prior to publication, as was reported by widespread media coverage and the United States Senate Permanent Subcommittee on Investigations which is cited in the essay.

114. Evidencing negligence and a reckless disregard for truth or falsity, Defendant knowingly and purposely avoided the truth and ignored evidence establishing the falsity of the statements prior to their publication.

115. Evidencing negligence and a reckless disregard for truth or falsity, Defendant published the statements about Dr. Amin without conducting even a cursory investigation, which failure constitutes gross negligence in light of the fact that the accusations have been refuted and discredited.

116.    Evidencing negligence and a reckless disregard for truth or falsity, Defendant published accusations against Dr. Amin that were so inherently improbable on their face as to raise serious doubts about their truth.

117.    Evidencing negligence and a reckless disregard for truth or falsity, Defendant published accusations against Dr. Amin that were so outrageous on their face as to raise serious doubts about their truth.

118.    Evidencing negligence and a reckless disregard for truth or falsity, Defendant published accusations against Dr. Amin without seeking his comment or participation, or the comment or participation of anyone other than Ms. Flowers, who also knew of the falsity of the statements yet wrote and published them anyway.

119.    Defendant had actual knowledge that the accusations against Dr. Amin were false prior to publication.

120.    Defendant published the statements with actual malice.

121.    Defendant financially benefited from sales of the book.

122.    On January 8, 2025, Dr. Amin sent via overnight delivery and email a letter to Defendant informing it of the falsity of the subject statements, which it already knew, and demanded that it retract the statements and cease and desist publication.

123.    Defendant stopped the publication of the defamatory statements via additional books, eBooks, and audio book, but the defamatory statements were still published to and read by third parties via Google Books and the books that had already been distributed for publication.

124.    Defendant published a purported retraction, but the retraction, on Defendant's website, was not published in as conspicuous and public a manner as the defamatory statements, which were published on Google books and also distributed in some physical copies of the Book.

125.    Further, the original defamatory statements were not made inadvertently or without malice but instead were published with malice.

126.    Defendant is liable to Dr. Amin for the defamatory statements published in the chapter of the Book.

### Damages

127.    The essay was published to third parties, and Defendant's false and defamatory statements therein were, in fact, viewed by third parties.

128.    As set forth above, the essay is defamatory and libelous *per se*, entitling Dr. Amin to presumed damages.

129.    As a direct and proximate result of the false and defamatory statements about him in the essay, Dr. Amin has suffered special damages, including but not limited to employment losses, medical treatment, and costs of reputational defense, which were natural and proximate consequences of the language Defendant used.

130.    As a direct and proximate result of the false and defamatory statements about him in the essay, Dr. Amin's personal reputation and his reputation as a physician have been permanently damaged.

131.    As a direct and proximate result of the false and defamatory statements about him in the essay, Dr. Amin has suffered stress, emotional distress, embarrassment, humiliation, anger, and other mental pain and suffering.

132.    As a direct and proximate result of the false and defamatory statements about him in the essay, Dr. Amin has suffered public hatred, contempt, scorn, and ridicule.

133.    The conduct of Defendant demonstrates willful misconduct and an entire want of care that raises to a conscious indifference to consequences.

134.    The false and defamatory accusations were published with constitutional actual malice thereby entitling Dr. Amin to an award of punitive damages.

135.    Dr. Amin is also entitled to an award of punitive damages to punish Defendant for its unlawful conduct and to penalize and deter it from repeating such unlawful and egregious conduct.

**Attorney's fees**

136.    Defendant acted in bad faith and/or has caused Dr. Amin unnecessary trouble and expense pursuant to O.C.G.A. § 13-6-11.

137.    Defendant's bad faith is also demonstrated by the fact that it published the defamatory statements years after the contents were discredited and disproven.

138.    Accordingly, Defendant is liable to Dr. Amin for his attorney's fees and expenses of litigation in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Dr. Amin demands a judgment in his favor, and against Defendant:

    (a)  for compensatory damages, in an amount not less than $1 million;

    (b)  for punitive damages, in an amount not less than $2 million;

    (c)  Awarding Plaintiff his costs and disbursements, including without limitation

        Plaintiff's attorney's fees pursuant to O.C.G.A. § 13-6-11, in an amount to be proven

        at trial; and

    (d)  Awarding Plaintiff such other relief as it deems equitable, just, and proper.

## REQUEST FOR JURY TRIAL

Plaintiff requests a jury trial on all the issues so triable.  This request is without prejudice to, or waiver of, Plaintiff's right to move for judgment on all issues that may be decided by the Court.

Dated: December 19, 2025

*Attorneys for Plaintiff*

EVANS BOWERS

/s/ Stacey G. Evans
Stacey G. Evans (Pro hac vice application forthcoming)
sevans@evansbowers.com
Ryan E. Harbin (Pro hac vice application forthcoming)
rharbin@evansbowers.com
J. Amble Johnson (Pro hac vice application forthcoming)
ajohnson@evansbowers.com
729 Piedmont Ave NE
Atlanta, GA 30308
(404) 850-6750
(404) 850-6748 (fax)

CHILIVIS GRUBMAN
DALBEY & WARNER LLP
Scott R. Grubman (Pro hac vice application forthcoming)
sgrubman@cglawfirm.com
1834 Independence Square
Atlanta, GA 30338
(404) 233-4171 (phone)
(404) 261-2842 (fax)


FIRESTONE GREENBERGER PLLC
*Local Counsel for Plaintiff*

/s/ Jordan Greenberger
Jordan Greenberger
104 West 40th Street, 4th Floor
New York, NY 10018
212-597-2255
jg@firegreenlaw.com