UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DR. MAHENDRA AMIN, M.D.,

     Plaintiff,

         v.

SPIEGEL & GRAU LLC,

     Defendant.

No. 1:25-cv-10582 (MMG)

ORAL ARGUMENT REQUESTED

## MEMORANDUM OF LAW IN SUPPORT
## OF MOTION TO DISMISS COMPLAINT

MILLER KORZENIK RAYMAN LLP
Mona Houck
David S. Korzenik
1501 Broadway, Suite 2015
New York, N.Y. 10036
(212) 752-9200
dkorzenik@mkslex.com
mhouck@mkslex.com

*Counsel for Defendant*
*Spiegel & Grau LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND...............................................................................................................2

ARGUMENT ....................................................................................................................3

I.      The Challenged Statements Are Absolutely Privileged Under
        the Fair Report Statute or Are Otherwise Non-Actionable..................................4

II.     The Complaint Should Also Be Dismissed Because Plaintiff Has Failed
        to Plausibly Plead That Any Statement Was Made With Actual Malice............18

CONCLUSION ..............................................................................................................23

**TABLE OF AUTHORITIES**

**Cases**

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ................................................................................3, 4

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ...................................................................................3

*Biro v. Conde Nast,*
   963 F. Supp. 2d 255 (S.D.N.Y. 2013) ..........................................4, 20, 21, 23

*Bose Corp. v. Consumers Union of U.S., Inc.,*
   466 U.S. 485 (1984).................................................................................19

*Bouchard v. Daily Gaz. Co.,*
   136 A.D.3d 1233 (3d Dep't 2016) ...............................................................5

*Cassava Sciences, Inc. v. Bredt,*
   2024 WL 1347362 (S.D.N.Y. Mar. 28, 2024)..............................................21

*Church of Scientology Int'l v. Behar,*
   238 F.3d 168 (2d Cir. 2001) .......................................................................7

*D'Arata v. New York Post,*
   226 A.D.3d 560 (2024)............................................................................ 20

*Dongguk Univ. v. Yale Univ.,*
   734 F.3d 113 (2d Cir. 2013) .....................................................................21

*Egiazaryan v. Zalmayev,*
   2011 WL 6097136 (S.D.N.Y. Dec. 7, 2011) ...............................................19

*El Greco Leather Prods. Co., Inc. v. Shoe World, Inc.,*
   623 F. Supp. 1038 (E.D.N.Y. 1985) .......................................................... 6

*Fishof v. Abady,*
   280 A.D.2d 417 (1st Dep't 2001) .............................................................. 6

*Ford v. Levinson,*
   90 A.D.2d 464 (1st Dep't 1982) ................................................................ 6

*Fridman v. Buzzfeed, Inc.,*
   2018 WL 2100452 (N.Y. Sup. Ct. May 07, 2018)........................................ 6

*Fridman v. Buzzfeed, Inc.,*
   No. 154895/2017, 2021 WL 1040531 (N.Y. Sup. Ct. Mar. 11, 2021)............ 15

*Friedman v. Bloomberg L.P.,*
   884 F.3d 83 (2d Cir. 2017) ...........................................................5, 10, 16, 18

*Garrison v. State of La.,*
   379 U.S. 64 (1964) ..................................................................................19

*Glantz v. Cook United, Inc.,*
   499 F. Supp. 710 (E.D.N.Y. 1979)............................................................10

*Glendora v. Gannett Suburban Newspapers,*
   201 A.D.2d 620 (2d Dep't 1994).................................................................16

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
   491 U.S. 657 (1989) .................................................................................... 21

*Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*,
   49 N.Y.2d 63 (1979) ................................................................................. 5, 16

*Humane League of Philadelphia, Inc. v. Berman & Co.*,
   108 A.D.3d 417 (1st Dep't 2013) ................................................................ 22

*Immuno AG. v. Moor-Jankowski*,
   567 N.E.2d 1270 (N.Y. 1991) ...................................................................... 17

*Jeanty v. City of Utica*,
   2017 WL 6408878  (N.D.N.Y. Aug. 18, 2017) .......................................... 22

*Kinsey v. New York Times Co.*,
   991 F.3d 171, 177 (2d Cir. 2021) 4

*Kramer v. Time Warner Inc.*,
   937 F.2d 767 (2d Cir. 1991) ..........................................................................2

*Lindberg v. Dow Jones & Co., Inc.*,
   2021 WL 3605621 (S.D.N.Y. Aug. 11, 2021) ............................................18

*Mann v. Abel*,
   885 N.E.2d 88 (N.Y. 2008) ........................................................................ 17

*Mulder v. Donaldson, Lufkin & Jenrette*,
   161 Misc. 2d 698 (Sup. Ct. 1994) ..............................................................15

*Orenstein v. Figel*,
   677 F. Supp. 2d 706 (S.D.N.Y.2009) ....................................................... 20

*Palin v. N.Y. Times Co.*,
   482 F. Supp. 3d 208 (S.D.N.Y. 2020) ...................................................... 23

*Panghat v. New York State Div. of Hum. Rts.*,
   89 A.D.3d 597 (1st Dep't 2011) ...................................................................5

*Rivera v. Time Warner Inc.*,
   56 A.D.3d 298 (1st Dep't 2008) ............................................................... 20

*Rodriguez v. Daily News, L.P.*,
   142 A.D.3d 1062 (2d Dep't 2016) ......................................................... 5, 16

*Sanderson v. Bellevue Maternity Hosp. Inc.*,
   259 A.D.2d 888 (3d Dep't 1999) ...............................................................21

*Sassower v. New York Times Co.*,
   48 A.D.3d 440 (2d Dep't 2008) .................................................................16

*St. Amant v. Thompson*,
   390 U.S. 727 (1968) ....................................................................................19

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
   864 F.3d 236 (2d Cir. 2017) ........................................................................ 8

*Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*,
   603 F. Supp. 2d 584 (S.D.N.Y. 2009) ........................................................ 6

**Statutes**

N.Y. Civ. Rights Law § 74 ................................................................................................ passim
N.Y. Civ. Rights Law § 76-a ....................................................................................................19

Defendant Spiegel & Grau LLC submits this memorandum of law in support of its motion to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

Plaintiff's Complaint impermissibly seeks to punish Spiegel & Grau for protected speech on a matter of public interest that is based on official proceedings and reputable reporting.

In a book of over 230 pages, Plaintiff is mentioned in a few paragraphs related to his work as an off-site physician treating detainees held at the Irwin County Detention Center in Ocilla, Georgia. The references to Plaintiff rely on a federal whistleblower complaint and other official statements—including a Senate investigation prompted by the whistleblower complaint—as well as reporting by *The New York Times*. Nothing in the book suggests actions that would lead to a different effect on a reader than the conduct detailed in the Senate report, which found that detainees under Plaintiff's care were subjected to gynecological procedures that were excessive, invasive, often unnecessary, and repeatedly performed without informed consent. In relying on this report, Spiegel & Grau is fully protected by the fair report privilege. In addition, many of the challenged statements otherwise fail to satisfy the elements of a defamation claim.

And Plaintiff is required—but has failed–to plead plausible facts that could lead to a finding of actual malice. Instead, he has relied on conclusory allegations, actual-malice buzzwords, and theories of actual malice that are insufficient and at odds with established law.

The Complaint should be dismissed in its entirety.

1

## BACKGROUND

The publication at the center of this case, *Holy Ground: On Activism, Environmental Justice, and Finding Hope,* is a collection of personal and political essays by a leading environmental justice activist, Catherine Coleman Flowers ("the Book"). *See* Declaration of Mona Houck, Ex. 1 (PDF of relevant Book chapter, *The Meaning of Life*).[1]

The focus of the chapter is the human cost and injustice in the well-documented history of medical mistreatment of women, particularly as it relates to the reproductive health of women of color—including the author's mother and the author herself. *Id.* The chapter recounts a range of abuses inflicted primarily on poor women of color, including forced and involuntary sterilization, experimentation on women who were never told what was taking place, and other inhumane practices and demeaning treatment. *Id.* The minimal references to Plaintiff appear in a few paragraphs of this single chapter of the book. *Id.* pp. 96-97. Relying on official reports and reporting from *The New York Times*, those paragraphs briefly cover the trajectory of the news related to Plaintiff: First, that in his role as a doctor serving an ICE detention facility, he was referenced in a whistleblower complaint alleging that excessive numbers of immigrant detainees under his care were told they needed hysterectomies; second, that *The Times* reported that other doctors and multiple women treated by Plaintiff had raised concerns about adequate explanation and consent for procedures; and, finally, that a congressional

---

[1] In considering a motion to dismiss for failure to state a claim, a district court may consider facts stated in the complaint or in documents attached to it as exhibits or incorporated in the complaint by reference. *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). Defendant is providing the court with copies of documents referenced in the Complaint: the relevant Book chapter, the whistleblower report, the staff report of the United States Senate Permanent Subcommittee on Investigations, *The New York Times* article, Representative Nancy Pelosi's statement, and the House Resolution. Houck decl., Ex. 1-6.

investigation launched in response to the whistleblower complaint concluded that "female detainees appear to have undergone excessive, invasive, and often unnecessary gynecological procedures" performed by Plaintiff. *Id.* pp. 96-97.

Shortly before the Book's scheduled publication in January 2025, Google Books made some excerpts available. Cmpl. ¶¶ 80, 81. Some copies of the Book were distributed to prepare for sales upon publication day. *Id.* ¶ 81. On January 8, 2025, Plaintiff's counsel sent a letter demanding removal of references to Plaintiff as well as compensation. *Id.* ¶ 99. Although disagreeing with Plaintiff's conclusions, Spiegel & Grau reacted swiftly, removing statements about Plaintiff from the Book, ceasing further distribution of the Book, withdrawing distributed copies where possible, removing references to Plaintiff from the ebook and audiobook versions, and, at the request of Plaintiff, publishing a retraction on its website. *Id.* ¶¶ 100, 102. Furthermore, and at great expense, Spiegel & Grau ordered a second printing from the corrected second edition of the Book from the remediated text. *Id.* ¶ 102.

Despite these diligent efforts, Plaintiff initiated this litigation on December 19, 2025, alleging that five multi-sentence statements were defamatory and seeking compensatory and punitive damages and legal fees.

### ARGUMENT

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.* Iqbal, 556 U.S. 662, 678 (2009). "Threadbare recitals

of the elements of a cause of action, supported by mere conclusory statements" or "naked assertions" are not enough to maintain a claim. *Id.*

Dismissal of this action is appropriate and consistent with courts' practice of early dismissal of claims that may infringe on First Amendment interests. *Iqbal* has "particular value" in the defamation context, "as forcing defamation defendants to incur unnecessary costs can chill the exercise of constitutionally protected freedoms." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 279 (S.D.N.Y. 2013) (citation omitted). "In other words, in defamation cases, Rule 12(b)(6) not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." *Id.*

Three grounds support dismissal in this case. First, the challenged statements are based on official proceedings and are therefore absolutely privileged. Second, to the extent that some of the wide swath of material the Complaint alleges to be defamatory is not covered by the fair report privilege, the material is otherwise not actionable because it is true, not about the plaintiff, and/or is protected opinion. Third, Plaintiff has failed to adequately plead that Spiegel & Grau made any of the challenged statements with knowledge that they were false or with serious doubts about their truth, as required.

## I.    The Challenged Statements Are Absolutely Privileged Under the Fair Report Statute or Are Otherwise Non-Actionable

Under New York law, no civil action may arise from the "publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding." N.Y. Civ. Rights Law § 74.[2] To be a "fair and true report" under the statute,

---

[2] New York law applies in this multistate publication case because New York is the state with the most significant interests: Defendant Spiegel & Grau is domiciled in New York, the challenged statements emanated from New York, and  New York has strong policy interests in regulating the conduct of its citizens and media. *See Kinsey v. New York Times Co.*, 991 F.3d 171, 177 (2d Cir. 2021).

"it is enough that the substance of the article be substantially accurate." *Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*, 49 N.Y.2d 63, 67 (1979). A statement is "substantially accurate" when "despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth." *Friedman v. Bloomberg L.P.*, 884 F.3d 83, 93 (2d Cir. 2017). *See also Holy Spirit Ass'n*, 49 N.Y.2d at 68 (noting that when applying the privilege, the publication's language "should not be dissected and analyzed with lexicographer's precision."). Whether a publication is a "fair and true report" is a matter of law for the court to decide. *Id.* at 67. This privilege "is absolute and applies even in the face of allegations of malice or bad faith." *Panghat v. New York State Div. of Hum. Rts.*, 89 A.D.3d 597, 597 (1st Dep't 2011).

New York courts apply a broad interpretation to the meaning of "official proceeding" under Section 74. The privilege has been found to apply to a range of investigations, including an investigation by the New York City Department of Consumer Affairs into the practices of air conditioner repair shops, a district attorney's investigation, and an internal governmental investigation of the Civil Works Administration. *See Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc.*, 603 F. Supp. 2d 584, 588 (S.D.N.Y. 2009) (collecting cases). The staff report of the United States Senate Permanent Subcommittee on Investigations is similarly an "official proceeding" covered by the statute. The privilege also applies to actions and statements of government officials, such as the House resolution and Representative Pelosi's statement. S*ee, e.g., Rodriguez v. Daily News, L.P.*, 142 A.D.3d 1062, 1063 (2d Dep't 2016) (NYPD press releases); *Bouchard v. Daily Gaz. Co.*, 136 A.D.3d 1233, 1235 (3d Dep't 2016) (Department of Justice press release).

In addition, the privilege covers "background" material related to an official proceeding that provides context to the allegations on which the publication reports. *See El Greco Leather Prods. Co., Inc. v. Shoe World, Inc.*, 623 F. Supp. 1038, 1043 (E.D.N.Y. 1985) (finding that publication's "further allegations" beyond allegations in a court complaint "constitute[d] background to the misconduct attributed ... in the complaint." (marks omitted)); *Fishof v. Abady*, 280 A.D.2d 417, 417-18 (1st Dep't 2001) (finding that the privilege "extends to the release of background material"); *Ford v. Levinson*, 90 A.D.2d 464, 465 (1st Dep't 1982) (finding that, although attorney's statement in newspaper article did "not clearly and directly fall within any of the allegations of the complaint," the statement was privileged because it constituted "background to the misconduct attributed ... in the complaint rather than a separate and independently defamatory accusation").

The privilege also applies to allegations in documents created by non-governmental entities that lead to official action. *See Fridman v. Buzzfeed, Inc.*, 2018 WL 2100452, at *2 (N.Y. Sup. Ct. May 07, 2018, *aff'd* 172 A.D.3d 441, 442 (1st Dep't 2019) (applying privilege to a document created by a private research firm and passed on to public officials, noting that the document "was part of the government's investigation"). The whistleblower complaint mentioned in the Book was addressed to multiple government agencies, led to calls for investigation and other action by the House of Representatives and Speaker Pelosi, and is cited in the Senate Subcommittee's report as spurring its investigation. Houck decl., Ex. 2-3, 5-6. It therefore provides not only background but is the very basis for the official investigation, and, as in *Fridman,* it falls within the scope of the privilege.

6

A comparison of these official documents with the paragraphs relating to Plaintiff shows that that the Book provides a fair account of the proceedings. *See* Houck decl. Ex. 1 (Book chapter), Ex. 2 (Whistleblower complaint), Ex. 3 (Senate report). The Complaint quotes as "false and defamatory statements of and concerning Dr. Amin" a block of text from the Book spanning multiple paragraphs, without identifying any specific alleged falsehood or defamatory language in many of the sentences. Cmpl. ¶¶ 87, 105. Some of these sentences should be dismissed from the case as a matter of law for the additional reason that they fail to meet one or more required elements for a defamation claim.[3] For ease of discussion and to avoid unnecessary repetition, this analysis will address that issue in tandem with the fair report issue, assessing each of the quoted paragraphs in turn.

**The Book's account of the whistleblower complaint**

The first challenged statements from the Book are these:

On September 14, 2020, in a footnote to President Donald Trump's unconscionable treatment of migrants, a nurse named Dawn Wooten, who worked at the Irwin County Detention Center in Ocilla, Georgia, filed a whistleblower complaint. She said that Dr. Mahendra Amin—the center's leading doctor who was not even a gynecologist—allegedly told nearly every woman who went to see him that she had to have a hysterectomy. Wooten referred to him as a "uterus collector." Cmpl. ¶ 105(a).

The first sentence is not only protected by the fair report privilege but also undoubtedly true and not of and concerning Plaintiff. The whistleblower complaint was filed by Project South and other immigrant groups as well as Ms. Wooten, it includes Ms. Wooten's allegations, it was addressed to multiple federal agencies, and it spurred a

---

[3] To sustain a claim, Plaintiff must establish that the statements he complains of were "(1) of and concerning [him], (2) likely to be understood as defamatory by the ordinary person, (3) false, and (4) published with actual malice, that is, either knowledge of falsity or reckless disregard of the truth." *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001).

Senate investigation. *See* Houck decl. Ex. 2 (Whistleblower complaint) and Ex. 3 (Senate

report). In addition, Plaintiff has not alleged any facts that point to specific falsity in this

sentence. A plaintiff "must identify how the defendant's statement was false to survive a

motion to dismiss." *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236,

245 (2d Cir. 2017). In other words, the plaintiff must "plead facts that, if proven, would

establish that the defendant's statements were not substantially true." *Id.* at 247. For all

these reasons, this sentence cannot be the basis of any claim.

The second and third sentences are protected by the fair report privilege. Among

many other relevant passages, the whistleblower complaint states:

> Several immigrant women have reported to Project South their concerns
> about how many women have received a hysterectomy while detained at ICDC.
> One woman told Project South in 2019 that Irwin sends many women to see a
> particular gynecologist outside the facility but that some women did not trust
> him. She also stated that "a lot of women here go through a hysterectomy" at
> ICDC. More recently, a detained immigrant told Project South that she talked to
> five different women detained at ICDC between October and December 2019 who
> had a hysterectomy done. When she talked to them about the surgery, the women
> "reacted confused when explaining why they had one done." The woman told
> Project South that it was as though the women were "trying to tell themselves it's
> going to be OK." She further said: "When I met all these women who had had
> surgeries, I thought this was like an experimental concentration camp. It was like
> they're experimenting with our bodies."
> Ms. Wooten also expressed concern regarding the high numbers of
> detained immigrant women at ICDC receiving hysterectomies. She stated that
> while some women have heavy menstruation or other severe issues that would
> require hysterectomy, "everybody's uterus cannot be that bad." Ms. Wooten
> explained:
>> Everybody he sees has a hysterectomy—just about everybody. He's even
>> taken out the wrong ovary on a young lady [detained immigrant woman].
>> She was supposed to get her left ovary removed because it had a cyst on
>> the left ovary; he took out the right one. She was upset. She had to go back
>> to take out the left and she wound up with a total hysterectomy. She still
>> wanted children—so she has to go back home now and tell her husband
>> that she can't bear kids... she said she was not all the way out under
>> anesthesia and heard him [doctor] tell the nurse that he took the wrong
>> ovary.
> Ms. Wooten also stated that detained women expressed to her that they
> didn't fully understand why they had to get a hysterectomy. She said: "I've had

> several inmates tell me that they've been to see the doctor and they've had hysterectomies and they don't know why they went or why they're going." And if the immigrants do understand what they're getting done, "some of them a lot of times won't even go, they say they'll wait to get back to their country to go to the doctor."
>
> The rate at which the hysterectomies have occurred have been a red flag for Ms. Wooten and other nurses at ICDC. Ms. Wooten explained:
>
>> We've questioned among ourselves like goodness he's taking everybody's stuff out...That's his specialty, he's the uterus collector.

Houck decl., Ex. 2 pp. 18-19. The central claims of the two challenged sentences—that Ms. Wooten said that Plaintiff "allegedly told nearly every woman who went to see him that she had to have a hysterectomy" and referred to him as "the uterus collector"—are drawn directly from the whistleblower complaint and thus fully protected by the fair report privilege. *Id.* Further, the complaint includes similar allegations from multiple other sources. *Id.*

The Senate investigation launched in response to the whistleblower complaint emphasizes that Plaintiff "holds no board certifications," Houck decl., Ex. 3 p. 4. It supports that assertion with statements from the certifying bodies, *id.* at 26 fn. 129, and includes a reviewing doctor's expert opinion that because Dr. Amin is not board certified, he "'likely does no or limited continuing education to stay current' on up-to-date medical practices in these areas" and that "it was likely that Dr. Amin would have pursued different treatment methods had he been board certified." *Id.* at 69. The reviewing doctor also noted that other board-certified OB-GYN providers practiced in the area and said he was " 'concerned' with how and why Dr. Amin was selected to treat this population." *Id.* (The report includes multiple other similar statements questioning Plaintiff's qualifications.) Thus, although it is technically not accurate that Plaintiff "was not even a gynecologist," the implication of that statement—that Plaintiff was not fully qualified to provide gynecological services to this institution—is well supported in the

official reports. The challenged statement "does not produce a different effect on a reader than would a report containing the precise truth" and is thus fully protected by the fair report privilege. *Friedman*, 884 F.3d at 93.

That the whistleblower complaint's allegation of mass hysterectomies was not confirmed by the ensuing investigation does not affect the privilege. The Book is an accurate report of the initial allegations that spurred the investigation, and the absolute privilege extends to falsehoods within the official documents. *See Glantz v. Cook United, Inc.,* 499 F. Supp. 710, 715 (E.D.N.Y. 1979) ("[E]ncompassed within the privilege is the right to publish a 'fair and true' report which contains information that is 'false' as a matter of fact."). In addition, the Book goes on to reflect what the Senate Subcommittee's investigation "finally revealed": that detainees under Plaintiff's care were "subjected to excessive, invasive, and often unnecessary procedures." Houck decl., Ex. 1 p. 97. As noted below, this statement reflects only a fraction of the findings of the investigation, which also included Plaintiff's "repeated failures to secure informed consent" and experts' conclusions that Plaintiff "subjected women to aggressive and unethical gynecological care."  Houck decl., Ex. 3 pp. 3, 10.

Given this context, where the arc of the story from initial complaint to conclusion is complete, there can be no finding that the Book would "produce a different effect on a reader." *Friedman,* 884 F.3d at 93. None of the investigation's findings would cause any reader to think more highly of Plaintiff. None would cause any reader to decide that he should be trusted with their gynecological care. The *type* of excessive, invasive, and unnecessary procedure would make no substantial difference in one's estimation of a doctor.

In addition, even aside from the fair report privilege, these challenged statements are not actionable because they are substantially true. The Book accurately reports the existence of the whistleblower complaint and the allegations it contains, fairly attributing the accusations to the whistleblower and noting that they were allegations.

**The Book's account of media reaction to the whistleblower report**

The second set of challenged statements:

Adding to this atrocity, Dr. Amin spoke no Spanish, and many of the vulnerable, detained women he violated spoke no English. The *New York Times* reported, "Both the reviewing doctors and all of the women interviewed by the *Times* raised concerns about whether Dr. Amin had adequately explained the procedures he performed or provided his patients with less invasive alternatives. Spanish-speaking women said a nurse who spoke Spanish was only sporadically present during their exams." They did not have the faintest idea what he was doing to them. Meanwhile, as an independent physician who was under contract with US Immigration and Customs Enforcement, this doctor was paid for each individual procedure that he executed. Cmpl. ¶ 105(b).

Nothing in this paragraph can support a defamation claim. The passage relies on the reporting of a widely respected news organization that includes multiple sources substantiating the claims.[4] *See* Houck decl., Ex. 4. In addition, the Senate Subcommittee's investigation established Plaintiff's "repeated failures to secure informed consent." Houck decl., Ex. 3 p. 3. The statements are substantially true, and, as discussed further below, reliance on this professional news organization defeats any claim that the statements could have been made with the required actual malice.

---

[4] Caitlin Dickerson, *et. al.*, Immigrants Say They Were Pressured Into Unneeded Surgeries, N.Y. Times (Sept. 29, 2020), *https://www.nytimes.com/2020/09/29/us/ice-hysterectomies-surgeries-georgia.html.*

11

**The Book's account of official reaction to the whistleblower report**

The third set of challenged statements:

Upon hearing about the whistleblower's complaint, House Speaker Nancy Pelosi described the conditions at the detention center as "a staggering abuse of human rights." On October 2, 2020, the House of Representatives condemned the practice in a congressional resolution. A congressional investigation finally revealed that "female detainees appear to have undergone excessive, invasive, and often unnecessary gynecological procedures" by a physician who was not even certified as a gynecologist. Cmpl. ¶ 105(c).

Every sentence in this paragraph is a fair and accurate account of an official proceeding and therefore absolutely privileged.

First, Representative Pelosi reacted to the whistleblower complaint by condemning the "appalling conditions in the whistleblower report" as "a staggering abuse of human rights" and called on the DHS inspector general to "immediately investigate the allegations detailed in this complaint." Houck decl., Ex. 5 (Pelosi statement).[5]

Second, the House reacted to the whistleblower complaint by passing a resolution noting the "shameful history in the United States of Black, Indigenous, people of color, immigrants, poor people, and people with disabilities being subjected to medical procedures without their informed consent." Houck decl., Ex. 6 (House resolution).[6] The resolution further noted that "a growing number of women are coming forward to share stories of unwanted, unnecessary medical procedures, including full or partial

---

[5] Representative Pelosi's statement is also available on her House webpage at https://pelosi.house.gov/news/press-releases/pelosi-statement-on-whistleblower-complaint-on-massive-health-care-abuse-at-ice

[6] The House resolution is also available on its official website: https://www.congress.gov/bill/116th-congress/house-resolution/1153/text

hysterectomies and other procedures involving their reproductive organs, performed without their knowledge or consent" and that "an initial review of available medical records by independent gynecologists raises serious questions about whether patients detained at the Irwin County Detention Center provided informed consent and whether prevailing standards of care were adhered to in their care." *Id.* The House also called for the Department of Homeland Security to comply with all requests related to investigating the allegations. *Id.*

Finally, the Senate Permanent Subcommittee on Investigations released its report, *Medical Mistreatment of Women in ICE Detention,* on November 15, 2022. Houck decl., Ex. 3 (Senate report).[7] The quotation in the third sentence of this set of challenged statements is drawn directly from key findings in this report, *id.* at 3 and repeated in various ways throughout the report. *See, e.g., id.* at 4:

> According to expert medical analysis conducted for the Subcommittee, under Dr. Amin's care, female detainees appear to have undergone excessive, invasive, and often unnecessary gynecological procedures.

In addition, the report notes that "the Subcommittee determined that Dr. Amin holds no board certifications," *id.*, and included the observations of an expert medical reviewer that "because Dr. Amin is not board certified, Dr. Amin 'likely does no or limited continuing education to stay current' on up-to-date medical practices in these areas." *Id.* at 8. The report also includes that expert's concern about "how and why Dr. Amin was selected to treat this population" given the lack of certification as well as his conclusion that "it was likely that Dr. Amin would have pursued different treatment

---

[7] The investigatory report, along with transcripts of related hearings and other supporting material, is also available on the Senate's website: https://www.congress.gov/event/117th-congress/senate-event/333320/text

13

methods had he been board certified." *Id.* at 69. There is no meaningful distinction

between the Book's statement that Dr. Amin "was not even certified as a gynecologist"

and the Senate report's repeated statements and related concerns that he had no *board*

certification as a gynecologist. That statement is therefore absolutely privileged under

the fair report statute.

The Senate investigation includes a wealth of other information supporting its

conclusion that Plaintiff's treatment of  detainees was seriously deficient. The

investigation found not only, as the Book stated, that detainees were subjected to

"excessive, invasive, and often unnecessary gynecological procedures," but also that:

- there appeared to be "repeated failures to secure informed consent" for procedures performed on detainees (*id.* at 3);
- the Department of Justice and the State of Georgia had sued Plaintiff in 2013 alleging that "he had committed Medicaid fraud by ordering unnecessary and excessive medical procedures" and that lawsuit was settled in 2015 when Plaintiff and his codefendants paid $520,000 to the federal government while admitting no wrongdoing (*id.* at 4);
- the Subcommittee's review of Plaintiff's treatment practices after that settlement, from 2017 to 2020, "identified a similar pattern of potentially excessive medical procedures" (*id.* at 5);
- Plaintiff "was an outlier in the number of invasive procedures performed and how much money he billed the government for these procedures"  (*id.* at 70);
- The facility housed about 4% of female ICE detainees nationwide from 2017 to 202, and Plaintiff accounted for about 6.5 percent of OB-GYN visits among ICE detainees in that period. Despite this, Plaintiff "performed nearly one-third of certain OB-GYN procedures on ICE detainees across the country between 2017 and 2020 and more than 90% of some key procedures (*id.* at 5);
- for the "specific OB-GYN procedures the Subcommittee examined, Dr. Amin received around half of all payments from ICE for these procedures" (*id.* at 17)
- a reviewing expert "identified significant issues with the care Dr. Amin provided to ICDC detainees," finding his "use of certain surgical procedures to be 'too aggressive' and inappropriate" (*id.* at 7);
- the expert "concluded that Dr. Amin's practices were 'woefully behind the times' and his treatment of ICDC detainees 'is not meeting current standards of care'" (*id.*);

14

- three other medical experts "concluded that Dr. Amin subjected women to aggressive and unethical gynecological care" (*id.* at 10)
- these experts found that "Dr. Amin quickly scheduled surgeries when non-surgical options were available, misinterpreted test results, performed unnecessary injections and treatments, and proceeded without informed consent" (*id.*);
- one of these experts "stated that in many cases, Dr. Amin appeared to have proceeded with unnecessary or excessive treatment regardless of patient conditions" (*id.*)
- "[b]ased on witness testimony to the Subcommittee and a review of medical records by a number of physicians, it appears that informed consent was not provided to multiple ICDC detainees treated" by Plaintiff (*id.* fn 48);
- Plaintiff "had a history of medical malpractice suits filed against him" (*id.* at 18);
- the Subcommittee interviewed six detainees "who described feeling confused, afraid, and violated after their encounters with Dr. Amin—and many of the women reported that they still live with pain and uncertainty regarding their fertility" (*id.* at 48); and
- one of the medical experts "highlighted to the Subcommittee that Dr. Amin's patients were members of a vulnerable group undergoing painful procedures from a doctor they did not choose" and stated that "she felt that 'power was abused'" (*id.* at 65).

Plaintiff's allegations that he did obtain consent or only conducted medically necessary procedures and that the challenged statements are therefore false has no bearing on the fair report analysis. Cmpl. ¶¶ 96, 98. Section 74 creates an absolute bar to a libel action when a publication is a substantially accurate account of the official proceedings themselves; it does not anticipate or require that the publisher conduct its own investigation into the truth of any allegations in those proceedings. Even if the Senate Subcommittee's conclusions were false, the Book's account of them is absolutely protected. *See Mulder v. Donaldson, Lufkin & Jenrette,* 161 Misc. 2d 698, 705 (Sup. Ct. 1994) (emphasizing that in a fair report analysis, "[t]he question is not whether or not the statement is 'true.' The question is whether it is a substantially accurate description of the claims made in the [official] proceeding."). *See also Fridman v. Buzzfeed,* 2021

15

WL 1040531, at *7 (quoting *Gubarev v. BuzzFeed, Inc.*, 340 F. Supp 3d 1304, 1314 (S.D. Fla. 2018) (applying § 74 to BuzzFeed's publication of the Steele Dossier and noting that the media's duty was "to faithfully recount official proceedings" not "to investigate extensively the allegations of the Dossier"); *Rodriguez*, 142 A.D.3d at 1064 (stating that the fair report statute "was designed precisely to protect the publisher of a fair and true report from liability" for factual errors in the report "and to relieve it of any duty to expose the error through its own investigation").

Nor is a plaintiff's vision of what *should* be published relevant to whether the actual publication is protected by the fair report privilege. *See, e.g., Holy Spirit Ass'n*, 49 N.Y.2d at 67-68 (finding no merit to plaintiff's contention that official reports were not properly characterized when the newspaper articles at issue neither included allegations not contained in those documents nor added language to provide greater credence to those documents than was appropriate); *Sassower v. New York Times Co.*, 48 A.D.3d 440, 441-42 (2d Dep't 2008) (finding that a newspaper article reporting on court hearings could not be a basis for a defamation action, although it allegedly failed to include and recount certain information as desired by the plaintiff); *Glendora v. Gannett Suburban Newspapers*, 201 A.D.2d 620, 620 (2d Dep't 1994) (finding that accuracy of a report for § 74 purposes was not altered by fact that article did not contain the plaintiff's view).

Thus, the Book's account is solidly within the fair report privilege and these statements are not actionable. If it were possible for these challenged statements to "produce a different effect on a reader than would a report containing the precise truth," that effect would be to convince readers that the truth was actually worse than the Book reflected. *Friedman*, 884 F.3d at 93.

16

**The Book's conclusion on historical attacks on women's bodily autonomy**

The fourth and fifth sets of challenged statements:

And so, over these many years, Black and Indigenous women, migrant women and white women, barely adolescent girls and older women have all had the agency of their bodies seized by others with the explicit goal of controlling their reproductive lives. I think of enslaved women—my great-great-grandmothers, their sisters and friends, and other enslaved women whose bodies were trafficked and raped on the plantations of my home state. Whose children were seized and sold like animals. Whose capacity to bear children was considered either an asset or a liability but rarely something deeply personal, something that demanded autonomy. Cmpl. ¶ 105(d).

I look at detainees whose children were ripped from them, some of whose wombs were ripped out of their bodies. Yes, I know that we have made great progress since the time when plantations dominated our economy. And yet, as we see too often with our justice system, and with our medical system, the plantation mentality endures. Cmpl. ¶ 105(e).

Nothing in these two paragraphs could form the basis of a defamation claim.

These paragraphs contain no false statements of fact, and Plaintiff has provided nothing beyond a bare assertion that the "statements are false" to allege otherwise. Cmpl. ¶ 88. Nor is any statement in these paragraphs *about* Plaintiff, a required element of a defamation claim. Rather, this passage is a conclusion to the chapter—the majority of which has nothing to do with Plaintiff—and its focus on historically poor treatment of women in vulnerable communities. Further, even if the statements were about Plaintiff, they are supported by the findings of the Senate Subcommittee and therefore absolutely privileged under Section 74. They are also protected as the nonactionable opinion of the author. *See Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 254 (1991) (only statements that a reasonable reader would believe were conveying facts about the plaintiff can be actionable); *Mann v. Abel*, 10 N.Y.3d 271, 276-77 (2008) ("Expressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation.").

17

In short, Plaintiff is referenced in the Book in the context of the long history of medical providers denying poor women and women of color bodily autonomy, and the Senate investigation concluded—in significant detail—that he did just that. The fair report privilege applies, and the statements are absolutely privileged. *Friedman*, 884 F.3d at 93.

## II.    The Complaint Should Also Be Dismissed Because Plaintiff Has Failed to Plausibly Plead That Any Statement Was Made With Actual Malice

The challenged statements are not actionable because the Complaint does not— and could not–plead actual malice. Section 76-a of the New York Civil Rights Law requires plaintiffs pursuing any "action involving public petition and participation" to establish "by clear and convincing evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false." N.Y. Civ. Rights Law § 76-a(2). The law applies to any claim based on "any communication in a place open to the public or a public forum in connection with an issue of public interest" or "any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest." N.Y. Civ. Rights Law § 76-a(1)(a). The statute "broadly" defines "public interest" to encompass "any subject other than a purely private matter." § 76-a(1)(d). These subjects "include matter[s] of political, social, or other concern to the community." *See Lindberg v. Dow Jones & Co., Inc.*, 2021 WL 3605621, at *8 (S.D.N.Y. Aug. 11, 2021) (quotations omitted) (equating longstanding New York definition of "public concern" with Section 76-a's "public interest"). Allegations of harm to detainees in a government-run facility are undoubtedly a matter of public interest, and the statute's actual malice requirement applies in this case.

18

To plead actual malice, Plaintiffs must plausibly allege facts that could "demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 n.30 (1984). Notably, actual malice "is not measured by whether a reasonably prudent [person] would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Rather, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* Because "erroneous statement is inevitable in free debate" and "must be protected if the freedoms of expression are to have the breathing space that they need to survive," false statements may be subject to civil liability only if they are made with a "high degree of awareness of the[ir] probable falsity." *Garrison v. State of La.*, 379 U.S. 64, 74 (1964) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 271-72 (1964)) (internal marks omitted).

The Complaint alleges no facts that could establish that Spiegel & Grau entertained serious doubts or had a high degree of awareness of the probable falsity of any statements published. Rather, the Complaint heavily relies on conclusory allegations that do no more than restate the legal standard for actual malice. It alleges that Spiegel & Grau "knowingly and purposefully avoided the truth and ignored evidence establishing the falsity of the statements" (¶ 114) and "had actual knowledge" that the statements were false (¶ 119). Plaintiff points to no facts to support these allegations.

These general, conclusory allegations lack the required factual basis to meet pleading requirements. *See, e.g., Egiazaryan v. Zalmayev*, 2011 WL 6097136, at *8

19

(S.D.N.Y. Dec. 7, 2011) (rejecting as sufficient repeated assertions that defendant acted with actual malice "because it is a legal conclusion not entitled to presumption of truth, and [the plaintiff] alleges no facts plausibly supporting that conclusion"); *Orenstein v. Figel*, 677 F. Supp. 2d 706, 711 (S.D.N.Y. 2009) (finding allegations that the defendant acted "knowingly, recklessly, and maliciously" insufficient because the "complaint provides neither factual support for these conclusions nor any explanation for why [the defendant] would have an interest in acting maliciously."); *D'Arata v. New York Post*, 226 A.D.3d 560, 561 (1st Dep't 2024) (conclusory statements "insufficient to allege actual malice," which is therefore "fatal to [plaintiff's] defamation per se claim"); *Rivera v. Time Warner Inc.*, 56 A.D.3d 298, 298 (1st Dep't 2008) ("Actual malice cannot be inferred from factual allegations merely suggesting that [the defendant] had reason to question the accuracy of the information at issue."). *See also Biro*, 963 F. Supp. 2d at 279-80 ("[P]leading 'actual-malice buzzwords' is simply not enough to nudge a case into discovery.") (citing *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 56 (1st Cir. 2012)).

Plaintiff's further theories about actual malice plead minimal facts about Spiegel & Grau's alleged conduct. Cmplt. ¶¶ 113, 115, 116-18. These theories are also insufficient to avoid dismissal as they are at odds with established law.

*First*, actual malice is a subjective standard that requires pleading facts that could establish each particular defendant's state of mind. Plaintiff's allegation that Spiegel & Grau published statements that "contradicted known facts that the accusations against Dr. Amin were false prior to publication, as was reported by widespread media coverage" and the Senate investigatory report fails to acknowledge this subjective requirement. Cmpl. ¶ 113. At best, this is a claim that Spiegel & Grau *should have known*

20

something that Plaintiff alleges others did know. That sort of allegation is consistent with a negligence standard but insufficient to allege, as the Complaint must, that Spiegel & Grau itself subjectively knew of any falsity. *See Biro,* 963 F. Supp. 2d at 283-84. Further, as noted above, the Senate investigation tends to *establish* Plaintiff's shortcomings in medical care of detainees rather than contradict them.

*Second*, neither a lack of investigation nor absence of a plaintiff's comment or perspective is enough to establish actual malice. Therefore, Plaintiff's allegations that Spiegel & Grau "published the statements about Dr. Amin without conducting even a cursory investigation," Cmpl. ¶ 115,  and "without seeking his comment," *id.* ¶ 118, do nothing to move his claims forward. It is well established that "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989). *See also Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 124-26 (2d Cir. 2013) ("[M]ere proof of failure to investigate, without more does not establish actual malice.... Even the failure to review one's own files is inadequate to demonstrate malice by the party responsible for publishing a statement."); *Sanderson v. Bellevue Maternity Hosp. Inc.*, 259 A.D.2d 888, 891 (3d Dep't 1999) ("[Defendant's] alleged failure to investigate the coworker's claims and listen to plaintiff's version of the events was, at most, negligent and did not constitute a reckless disregard for the truth which could rise to the level of actual malice."); *Cassava Sciences, Inc. v. Bredt*, 2024 WL 1347362, *28 (S.D.N.Y. Mar. 28, 2024) ("[A]llegations of failing to heed Plaintiff's public denials or seek out Plaintiff's side of the story" by interviewing plaintiff "are insufficient to adequately plead actual malice.").

21

Any requirement to investigate or interview Plaintiff is especially inapt in this context, where the Book relied on official reports protected by the fair report privilege. A publisher has no responsibility to fact-check official statements or pursue the plaintiff's version of events. *See Jeanty v. City of Utica,* 2017 WL 6408878, at \*19 (N.D.N.Y. Aug. 18, 2017) ("[T]he privilege exists even though the publisher himself does not believe the defamatory words he reports to be true and even when he knows them to be false." (quoting Restatement (Second) of Torts § 611 cmt. a (1977)). Indeed, Plaintiff concedes that failure to investigate could not establish actual malice, stating that it "constitutes gross negligence." Cmpl. ¶ 115. This is a legal conclusion Defendant does not accept but which would also require dismissal.

*Third,* publishers are entitled to rely not only on official reports but also on the reporting of others. The Book's reliance on these sorts of reputable sources, including official reports and reporting by *The New York Times*, defeats Plaintiff's allegation that it published statements that were "so inherently improbable" or "so outrageous on their face as to raise serious doubts about their truth." Cmpl. ¶¶ 116, 117. *See, e.g., Humane League of Philadelphia, Inc. v. Berman & Co.,* 108 A.D.3d 417, 419 (1st Dep't 2013) ("[Defendant's] good faith reliance on newspaper articles precludes a finding of actual malice.") (citing *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1297 (D.C. Cir. 1988)). The *Times* article, the whistleblower report, and the Senate Subcommittee report all include multiple sources who provide consistent accounts. That context raises no serious doubt about the truth. In addition, the repetition of legal buzzwords like "inherently improbable" and legal conclusions, as noted above, add no plausibility to Plaintiff's pleading.

22

*Finally,* while the Complaint fails to plead facts that could establish actual malice, it does include details that show Spiegel & Grau *did not* act with actual malice. Plaintiff acknowledges that Spiegel & Grau acted swiftly to not only issue a retraction, but also to recall printed copies of the Book, print a new version without references to Plaintiff, and eliminate references to Plaintiff from the ebook and audiobook versions. Cmpl. ¶¶ 100, 102. These facts negate actual malice. *See Biro,* 963 F. Supp. 2d at 283 (finding that a prompt retraction "makes it less likely that [the defendant] acted with actual malice"); *Palin v. N.Y. Times Co.,* 482 F. Supp. 3d 208, 222 (S.D.N.Y. 2020) ("[W]illingness … to quickly acknowledge and correct [an] error ordinarily weighs against a finding of actual malice.").

In short, Plaintiff's Complaint fails to include any plausible nonconclusory factual allegations that would support a conclusion that Spiegel & Grau either knew any challenged statements were false or had serious doubts about their truth. It must be dismissed.

## CONCLUSION

For the foregoing reasons, Spiegel & Grau respectfully asks that this Court dismiss the Complaint with prejudice and grant any other relief the Court deems just and proper.

Dated:  February 27, 2026                    Respectfully submitted,

MILLER KORZENIK RAYMAN LLP

/s/ Mona Houck

Mona Houck
David S. Korzenik
*Counsel for Defendant Spiegel & Grau LLC*

23

**CERTIFICATION OF WORD COUNT**

In compliance with Rule 7.1(c) of the Joint Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, I certify that the word count in this Memorandum of Law (excluding the caption, tables, and other excluded elements) is 7,451 words, as established by the count of the word-processing program used to prepare it.

Dated:  February 27, 2026        /s/ Mona Houck                              
                                 Mona Houck